1  STROOCK & STROOCK & LAVAN LLP
2  JULIA B. STRICKLAND (State Bar No. 83013)
   SCOTT M. PEARSON (State Bar No. 173880)
3  SETH M. GOLDSTEIN (State Bar No. 232071)
   2029 Century Park East, 16th Floor
4  Los Angeles, California 90067-3086
   Telephone: 310-556-5800
5  Facsimile: 310-556-5959
   lacalendar@stroock.com
6
   Attorneys for Defendant and Counterclaimant
7    ADVANCEME, INC.
8
9              UNITED STATES DISTRICT COURT
10             CENTRAL DISTRICT OF CALIFORNIA
11                    WESTERN DIVISION

| | |
|---|---|
| RICHARD B. CLARK, f/d/b/a AUSTIN'S BARBEQUE & TAVERN; JJ MANAGEMENT CO., INC.; and MICHAEL RABINOWITZ, d/b/a GOODFELLOW AUTOMOTIVE, Individually and On Behalf of All Others Similarly Situated,<br><br>            Plaintiffs,<br><br>    vs.<br><br>ADVANCEME, INC., d/b/a SUPPLY SERVICES,<br><br>            Defendant.<br><br>ADVANCEME, INC.,<br><br>            Counterclaimant,<br><br>    vs.<br><br>JJ MANAGEMENT CO., INC.; JOSEPH BONAFEDE; and MICHAEL RABINOWITZ, d/b/a GOODFELLOW AUTOMOTIVE,<br><br>            Counterclaim Defendants. | Case No. CV-08-3540 VBF (FFMx)<br><br>CLASS ACTION<br><br>**DECLARATION OF ERIK CANNON IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT AND SUMMARY ADJUDICATION**<br><br>[Notice Of Motion And Motion, Memorandum Of Points And Authorities, Statement Of Uncontroverted Facts And Conclusions Of Law and Appendix of Authorities filed and [Proposed] Order lodged concurrently]<br><br>Date:  August 31, 2009<br>Time:  1:30 p.m.<br>Place: Courtroom 9<br>       312 N. Spring Street<br>       Los Angeles, CA 90012 |

LA 51163402v1

I, Erik Cannon, declare:

1. I am currently the Executive Vice President of Operations for Capital Access Network, the parent company of defendant AdvanceMe, Inc. ("AMI"). Before assuming that position approximately one year ago, I was employed by AMI in various positions beginning in October 2004. My last position with AMI was Senior Vice President of Operations. I submit this Declaration in support of AMI's Motion for Partial Summary Judgment and Summary Adjudication. The following facts are within my own personal knowledge or based upon business records created or kept in the ordinary course of business by AMI. If called as a witness, I could and would competently testify to these facts.

2. Plaintiff Richard B. Clark f/d/b/a Austin's Barbecue & Tavern ("Clark") entered into Merchant Agreements with AMI dated May 4, 2004 and March 8, 2005. True and correct copies of these Merchant Agreements are attached hereto as Exhibits A and B, respectively.

3. Plaintiff JJ Management Co., Inc. ("JJ Management") entered into Merchant Agreements with AMI dated May 2, 2006, July 24, 2006 and June 7, 2007. True and correct copies of these Merchant Agreements are attached hereto as Exhibits C, D and E, respectively.

4. Plaintiff Michael Rabinowitz d/b/a Goodfellow Automotive ("Rabinowitz") entered into a Merchant Agreement with AMI dated August 8, 2007. A true and correct copy of this Merchant Agreement is attached hereto as Exhibit F.

5. Each of the aforementioned agreements has a section on the first page entitled "Purchase and Sale of Future Receivables" which states that AMI will pay the merchant a specified purchase price for a specified amount of the merchant's future credit card receivables.[1] This section further provides that AMI shall be

---

[1] While I refer to "credit card" receivables in this Declaration for simplicity, the receivables AMI buys also are generated by other types of cards such as debit cards.

- 1 -

1  entitled to receive a specified percentage of the merchant's credit card receivables
2  until all of the purchased receivables have been delivered.
3     6.     Each of the aforementioned agreements (in Section 2.8 or Section 8.0)
4  expressly provides: "**Merchant Not Indebted To Company.** Merchant is not a
5  debtor of [AMI] as of the date of this Agreement."
6     7.     AMI considers Plaintiffs' affirmative obligations to AMI to be limited
7  to several covenants that essentially provide that Plaintiffs will not prevent AMI
8  from collecting the receivables it purchased or otherwise interfere with AMI's ability
9  to receive the benefit of its bargain.  While the language of these covenants varies
10 slightly from agreement to agreement, the Rabinowitz agreement illustrates the
11 nature of these obligations:

> Merchant agrees (i) to conduct its business consistent with past practice;
> (ii) to exclusively use Processor for the processing of all of its Card
> transactions, to not change its arrangements with Processor in any way
> that is adverse to Company and to not take any action that has the effect
> of causing the processor through which Cards are settled to be changed
> from Processor to another processor; (iii) to not take any action to
> discourage the use of Cards and to not permit any event to occur that
> could have an adverse effect on the use, acceptance or authorization of
> Cards for the purchase of Merchant's services and/or products; (iv) to
> not open a new account other than the Account to which Card settlement
> proceeds will be deposited and to not take any action to cause Future
> Receivables or Receivables to be settled or delivered to any account
> other than the Account; (v) not to sell, dispose, convey or otherwise
> transfer its business or assets without the express prior written consent
> of Company and the assumption of all of Merchant's obligations under
> this Agreement pursuant to documentation reasonably satisfactory to

- 2 -

Company; and (vi) to maintain a Minimum Balance (as defined below) in the Account (collectively, the "Merchant Contractual Covenants"). Performance of these Merchant Contractual Covenants is secured by a lien on the Merchant's business assets and personally guaranteed by the owner of the merchant.

8. Because it is purchasing <u>future</u> credit card receivables, AMI takes the risk that it will not collect all of the purchased receivables if, for example, the merchant goes out of business before all of the receivables are generated.

9. The Merchant Contractual Covenants protect AMI against certain other risks, each of which involves merchant attempts to deny AMI the ability to collect receivables as agreed. Most significantly, for most merchants, AMI depends on credit card processors to provide AMI with the specified percentage of merchants' credit card receivables from each settlement batch.[2] If a merchant switches from the agreed-upon processor (which has committed to deliver AMI's specified percentage of receivables to AMI) to a different processor, all of the receivables would be delivered to the merchant, denying AMI its share. Similarly, if a merchant signs up with a second processor and "splits" its processing between the two processors, AMI would receive only a portion of its share of each day's receivables. AMI also can lose the benefit of its bargain if the merchant materially changes the nature of its business, discourages the use of credit cards, changes the account into which credit card receivables are deposited, or sells the business to someone who has not assumed the merchant agreement.

10. To make sure that the receivables it purchases are delivered as agreed, AMI monitors the flow of receivables from merchants and compares them to historical patterns to see whether there are any indications of a possible breach of a Merchant Contractual Covenant. For example, if the volume of receivables suddenly

---

[2] Some merchants elect to have AMI debit its share of the merchant's receivables directly from the merchant's bank account rather than having the credit card processor provide AMI with its specified percentage.

- 3 -

1 | drops by 50%, that is an indication of possible split processing. If AMI detects a
2 | possible breach from receivable flow volumes, it then contacts the merchant to try to
3 | ascertain what actually is happening. If the merchant cannot be reached or the
4 | merchant's explanation seems questionable, AMI may investigate further by taking
5 | steps such as calling the merchant's trade references and pulling credit reports to
6 | look for evidence of a change in processors.
7 |      11.    AMI's policy is to sue merchants and/or guarantors only if the merchant
8 | breaches one or more of the Merchant Contractual Covenants and refuses to cure the
9 | breach. However, because AMI has limited information about the behavior and
10 | status of its merchants, which are located throughout the country, it is possible for
11 | AMI to assert a breach of these covenants in error. Nevertheless, each year AMI
12 | closes numerous accounts after the merchant has gone out of business – without
13 | collecting all of the receivables it purchased and without suing either the merchant or
14 | the guarantor because AMI had no reason to believe the merchant breached a
15 | Merchant Contractual Covenant.
16 | //
17 | //
18 | //
19 | //
20 | //
21 | //
22 | //
23 | //
24 | //
25 | //
26 | //
27 | //
28 | //

12. None of the lawsuits filed by AMI against Plaintiffs sought "repayment" of advances or "interest" on advances. Rather, each of those lawsuits alleged breaches of Merchant Contractual Covenants. True and correct copies of AMI's complaints or counterclaims (as applicable) against Clark, JJ Management and Rabinowitz are attached hereto as Exhibits G, H and I, respectively.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 20th day of July, 2009, at Kennesaw, Georgia.

_____
Erik Cannon

LA 51163402v1

-5-